ELAINE WISEMAN, ADMINISTRATRIX (ESTATE
OF BRYANT WISEMAN) *v.* JOHN
J. ARMSTRONG ET AL.
(SC 18152)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and
McLachlan, Js.

Argued September 8, 2009—officially released March 9, 2010

96

*Antonio Ponvert III*, for the appellant (plaintiff).

*Terrence M. O'Neill*, assistant attorney general, with whom was *Ann E. Lynch*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Henri Alexandre*, assistant attorney general, for the appellees (named defendant et al.).

*Opinion*

VERTEFEUILLE, J. The plaintiff, Elaine Wiseman, in her capacity as administratrix of the estate of her deceased son, Bryant Wiseman (decedent), appeals[1] from the judgment of the trial court rendered in favor of the named defendant, John J. Armstrong, in his

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

capacity as the commissioner of correction, and others[2] in her action for the wrongful death of the decedent while he was incarcerated at Garner correctional institution in Newtown. The plaintiff alleged that the decedent's death resulted from the defendants' alleged indifference to the decedent's serious medical and mental health needs and the use of excessive force. The plaintiff alleged that the decedent, who was mentally ill, died after being forcefully subdued and restrained by the defendants after he had become disruptive due to a lack of antipsychotic medication.

The case was tried to a jury, which returned a verdict for the defendants, and the trial court accepted the verdict. Thereafter, pursuant to Practice Book § 16-32,[3] the plaintiff requested that the trial court poll the jury. The trial court denied the plaintiff's request. The plaintiff subsequently filed a motion to set aside the verdict and for a new trial, contending, inter alia, that § 16-32 imposed a mandatory duty on the trial court to poll the jury and the trial court's failure to do so constituted per se reversible error. Following oral argument and the receipt of memoranda of law, the trial court denied the motion. The trial court concluded that even if the

[2] The additional defendants for whom judgment was rendered were Reginald Hoffler, a psychiatrist, and correctional officers Michael A. Pace, Kevin Cowser, James E. Reilly, Donald J. Hebert, Robert G. Stack, Jose Zayas, Kevin J. Dandolini, Angelo P. Gizzi, Edwin Myers, William Smith, Vaughn Willis and Frank Mirto. For purposes of this opinion, we refer to Armstrong and these additional parties as the defendants.

The plaintiff originally had named other parties as defendants as well, but the claims against those parties either were withdrawn or dismissed, and those parties are not involved in this appeal.

[3] Practice Book § 16-32, regarding procedure in civil matters, provides: "Subject to the provisions of Section 16-17, after a verdict has been returned and before the jury has been discharged, the jury shall be polled at the request of any party or upon the judicial authority's own motion. The poll shall be conducted by the clerk of the court by asking each juror individually whether the verdict announced is such juror's verdict. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or it may be discharged."

right to a jury poll pursuant to § 16-32 was mandatory, the court's denial of the plaintiff's request was harmless. The trial court therefore rendered judgment in accordance with the jury's verdict. This appeal followed.

On appeal, the plaintiff claims that the trial court improperly denied her motion to set aside the verdict. Specifically, the plaintiff asserts that the trial court violated the mandatory provisions of § 16-32 by refusing to poll the jury and improperly concluded that the failure to poll was harmless. The plaintiff contends that a failure to poll always causes harm, and therefore constitutes per se reversible error. The defendants respond that § 16-32 is discretionary, and the failure to poll should be subject to harmless error review by this court. We agree with the plaintiff that § 16-32 imposes a mandatory duty on the trial court to poll the jury when requested to do so by a party, but we also agree with the defendants that the failure to poll should be subject to review for harmlessness. Because we agree with the trial court's conclusion that there was no harm in the present case, we affirm the judgment of the trial court.

I

The plaintiff first claims that the trial court violated § 16-32 by denying her request to poll the jury. Specifically, the plaintiff contends that because § 16-32 has language identical to Practice Book § 42-31,[4] which this court has construed as imposing a mandatory duty on the trial court to poll a jury in a criminal trial when

---

[4] Practice Book § 42-31, regarding procedure in criminal matters, provides: "After a verdict has been returned and before the jury has been discharged, the jury shall be polled at the request of any party or upon the judicial authority's own motion. The poll shall be conducted by the clerk of the court by asking each juror individually whether the verdict announced is such juror's verdict. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or it may be discharged."

requested; *State* v. *Pare*, 253 Conn. 611, 625, 755 A.2d 180 (2000); § 16-32 should similarly be construed as imposing a mandatory duty on the trial court to poll the jury in a civil trial upon a party's request.[5] The defendants respond that § 16-32 is discretionary because it is a rule of civil practice unlike § 42-31, which is a rule of criminal practice. Specifically, the defendants assert that because *Pare* relied on factors that are germane only in the criminal context, this court's analysis of § 42-31 is inapplicable to § 16-32, which applies to civil cases. We agree with the plaintiff.

As a preliminary matter, we set forth the applicable standard of review. "The interpretive construction of the rules of practice is to be governed by the same principles as those regulating statutory interpretation." *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 733–34, 830 A.2d 228 (2003); see also *State* v. *Pare*, supra, 253 Conn. 622 ("principles of statutory construction apply 'with equal force to Practice Book rules' "). The interpretation and application of a statute, and thus a Practice Book provision, involves a question of law over which our review is plenary. *Commissioner of Social Services* v. *Smith*, supra, 734.

"The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [General Statutes] § 1-

---

[5] The plaintiff asserts that § 16-32 imposes a mandatory obligation upon the trial court to poll the jury only when a timely request is made. In the present case there is no dispute that the plaintiff's request to poll was timely.

2z[6] directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . We recognize that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise . . . ." (Citations omitted; internal quotation marks omitted.) *Rainforest Cafe, Inc.* v. *Dept. of Revenue Services*, 293 Conn. 363, 371–73, 977 A.2d 650 (2009).

In accordance with § 1-2z, we first turn to the relevant language of the rule of practice at issue, § 16-32, which provides that "after a verdict has been returned and before the jury have been discharged, the jury *shall* be polled at the request of any party or upon the judicial authority's own motion." (Emphasis added.) Practice Book § 16-32. We must determine whether "shall" as used in § 16-32 is mandatory or directory. See *Weems* v. *Citigroup, Inc.*, 289 Conn. 769, 790, 961 A.2d 349 (2008). "The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience.

---

[6] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

. . . If it is a matter of substance, the statutory provision is mandatory. . . . If, however, the . . . provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory . . . ." (Internal quotation marks omitted.) Id. "Definitive words, such as must or shall, ordinarily express legislative mandates of a nondirectory nature." (Internal quotation marks omitted.) *State* v. *Pare*, supra, 253 Conn. 623. As we recently noted, "the word shall creates a mandatory duty when it is juxtaposed with [a] substantive action verb." (Internal quotation marks omitted.) *Rainforest Cafe, Inc.* v. *Dept. of Revenue Services*, supra, 293 Conn. 376.

In applying these principles to § 16-32, we focus on the text stating that "the jury shall be polled . . . ." This language juxtaposes "shall" with the verb "polled." Polling the jury, moreover, is the purpose of this provision, and is not a matter of convenience. As a result, we conclude that the poll is a substantive right established by this rule of practice and thus imposes a mandatory duty on the trial court.

The history of § 16-32 provides interpretive guidance that buttresses our textual analysis. When this rule was in the process of being adopted in 1997, provisionally codified as Practice Book § 3181,[7] it contained the word "shall." This language copied the text of the then

---

[7] The proposed language of Practice Book § 3181 provided: "After a verdict has been returned and before the jury have been discharged, the jury shall be polled at the request of any party or upon the judicial authority's own motion. The poll shall be conducted by the clerk of the court by asking each juror individually whether the verdict announced is such juror's verdict. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or they may be discharged." See Connecticut Law Journal, Vol. 59, No. 5, p. 65PB (July 29, 1997). It subsequently was renumbered as § 16-32 and amended once in June, 1998, to add the clause "Subject to the provisions of Section 16-17 . . . ." See Practice Book, 1999, § 16-32. Thus, this provision has contained the word "shall" since its inception.

recently amended Practice Book § 869, which was the precursor to § 42-31, the criminal procedure equivalent provision. Prior to 1995, § 869 provided in relevant part that "[a]fter a verdict has been returned and before the jury have been discharged, the jury *may* be polled at the request of any party or upon the judicial authority's own motion." (Emphasis added.) Practice Book, 1978, § 869. In June, 1995, the judges of the Superior Court amended § 869, to take effect October 1, 1995, by replacing the word "may" with the word "shall"; see Practice Book, 1996, § 869; in order to emphasize the mandatory nature of the poll when requested in a criminal case. See *State* v. *Pare*, supra, 253 Conn. 624–25; see generally *Krondes* v. *Norwalk Savings Society*, 53 Conn. App. 102, 121–22, 728 A.2d 1103 (1999) ("§ 42-31 . . . now *requires* that the jury be polled at the request of any party" [emphasis added]). Therefore, when the judges of the Superior Court adopted § 3181, the precursor to § 16-32, in 1997, and copied the language of the recently amended § 869, the criminal proceedings provision, it is logical to conclude that they similarly intended to impose a mandatory duty upon the trial court to poll the jury in a civil case when requested.

Pursuant to § 1-2z, we next consider Practice Book § 16-32 in relation to other provisions of the Practice Book. It is well settled that we look "to the broader statutory scheme to ensure the coherency of our construction" because it is presumed the legislature "created a harmonious and consistent body of law." (Internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008). Since this court previously has construed identical language in Practice Book § 42-31 as imposing a mandatory duty on the trial court to poll the jury, it would undermine the harmony and internal consistency of the rules of practice to conclude that the same language in § 16-32

is discretionary.[8] See *Burton* v. *Planning Commission,* 209 Conn. 609, 614, 553 A.2d 161 (1989) (construing identical language in two Practice Book provisions in the same manner); *State* v. *Hawley,* 102 Conn. App. 551, 554, 925 A.2d 1197 ("[a] court may look for guidance to the construction given by [our Supreme Court] to identical language contained in other statutes" [internal quotation marks omitted]), cert. denied, 284 Conn. 914, 931 A.2d 933 (2007). Additionally, Practice Book § 16-30[9] requires that a civil jury verdict be unanimous. When § 16-32 is read in light of § 16-30, it is clear that § 16-32 gives parties a procedure to verify unanimity and enforce the right found in § 16-30. This analysis is also supported by Practice Book § 1-8,[10] which requires that Practice Book provisions be construed to "advance justice . . . ." Providing parties with the opportunity to confirm the unanimity of the verdict perpetuates justice, ensures transparency and creates consistency in the rules of practice.

---

[8] We are mindful that § 16-32 is a rule of civil practice, while § 42-31 is a rule of criminal practice. As a result, § 42-31 necessarily incorporates and codifies substantive criminal principles that are not applicable within the civil context. Nonetheless, the substantive components of the two rules do not affect our textual analysis.

We note that a new provision to the Federal Rules of Civil Procedure recently was enacted. On December 1, 2009, rule 48 (c) of the Federal Rules of Civil Procedure became effective, imposing a mandatory duty on the trial court to poll the jury upon request. Rule 48 (c) provides in relevant part: "After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. . . ." According to the minutes of the Civil Rules Advisory Committee, which discussed the rule change in its draft proposal form, rule 48 (c) is "nearly verbatim" to rule 31 (d) of the Federal Rules of Criminal Procedure, thus "honoring the preference to avoid discrepancies between parallel provisions that may generate unwarranted implications." Civil Rule Advisory Committee Minutes, May 22 and 23, 2006, p. 27.

[9] Practice Book § 16-30 provides: "The verdict shall be unanimous and shall be announced by the jury in open court."

[10] Practice Book § 1-8 provides: "The design of these rules being to facilitate business and advance justice, they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice."

Even though § 16-32, unlike § 42-31, is not based on a substantive statute or constitutional provision, we nevertheless determine that the plain language of § 16-32 imposes a mandatory obligation on the trial court to poll the jury when requested. Cf. *State* v. *Pare*, supra, 253 Conn. 624 (interpreting § 42-31 as mandatory partly because it is "a mechanism for preserving an essential characteristic of both the state and federal constitutions"). Accordingly, we conclude that the trial court improperly refused the plaintiff's request to poll the jury.

II

We next must address whether the trial court's failure to poll the jury in violation of the mandatory provisions of § 16-32 requires us to reverse the trial court's judgment. The trial court based its decision denying the plaintiff's motion to set aside the verdict on the legal determination that even if its failure to poll constituted error, the failure was harmless. On appeal, the plaintiff claims that the trial court should have concluded that its failure to poll the jury constituted reversible error. Specifically, the plaintiff contends that because there is no means of ascertaining the result of a poll not taken, a failure to poll the jury in violation of § 16-32 always causes harm. The defendants respond that the trial court correctly concluded that its failure to poll the jury caused no harm. We agree with the defendants.

The following additional facts are relevant to our resolution of this issue. After a trial that spanned the course of approximately twenty-one days and included more than eighty exhibits and testimony from more than twenty-five witnesses, the trial court charged the jury and provided them with an eleven page verdict form containing specific interrogatories that addressed liability and damages with regard to the multiple defendants. During its deliberations, the jury did not seek

clarifying instructions; the only requests that the jury made were for permission to view a digital video disc that had been admitted into evidence and for assistance in getting that disc to play.

After deliberating for approximately three hours, the jury announced that it had reached a verdict. The jury entered the courtroom, and the clerk called the roll of jurors to ensure that all members of the jury were present. The trial court formally asked the jury whether they had reached a verdict, to which the foreperson responded "yes." The foreperson, who had signed the verdict form on behalf of the jury, then handed it to the clerk, who then read the full verdict form to the jury. The trial court accepted the verdict and asked that it be recorded, and the clerk, for a second time, read the full verdict to the jury. None of the jurors indicated that they had any problem with the verdict as read. The trial court then thanked the jury for their service and stated: "The case has been lengthy. It has been complicated. You have been punctual. You have been very attentive. And your deliberations indicate a thoughtful verdict."[11] The plaintiff's counsel then asked the trial court to poll the jury, which it refused to do.[12] Following its denial of that request, the trial court adjourned court.

The plaintiff subsequently filed a motion to set aside the verdict claiming, inter alia, that the trial court's denial of her request to poll the jury constituted per se reversible error. The trial court disagreed. It reasoned that "even if the provisions of . . . § [16-32] are mandatory, the court finds that its denial of the plaintiff's

[11] The jury correctly followed the instructions on the interrogatory sheet. For instance, the jury left blank several questions pursuant to the included instructions. There were, therefore, no irregularities in the manner in which the jury completed the verdict form.

[12] "[The Plaintiff's Counsel]: If the court please, may the jury just be individually polled, Your Honor?

"The Court: That motion is denied."

request to poll the jury was harmless. The jury in this case did not indicate any confusion regarding the charge or lack of unanimity in the course of their deliberations and the eleven page form containing the interrogatories and verdict shows no indication of any inconsistencies. The plaintiff has made no argument that the denial of her request to poll the jury affected the outcome of the trial." The trial court then rendered judgment in favor of the defendants, consistent with the jury's verdict.

We begin our analysis with the applicable standard of review, as well as a brief review of background principles relating to harmless error review. A trial court's legal determination is a question of law and is subject to plenary review. *Caruso* v. *Bridgeport*, 285 Conn. 618, 627, 941 A.2d 266 (2008); *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 96–97, 801 A.2d 759 (2002). We therefore have plenary review over the trial court's decision to undertake harmless error review rather than apply per se reversible error. "The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Internal quotation marks omitted.) *Desrosiers* v. *Henne*, 283 Conn. 361, 366, 926 A.2d 1024 (2007). Generally, a trial court's "ruling will result in a new trial only if the ruling was both wrong *and* harmful." (Emphasis in original.) *Prentice* v. *Dalco Electric, Inc.*, 280 Conn. 336, 358, 907 A.2d 1204 (2006), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007).

Following the turn of the twentieth century, harmless error review became the applicable standard in American jurisprudence, in reaction to the prior, rigid application of per se reversible error. Before the harmless error reform, the American legal system had followed what was known in the English courts as the "Exchequer Rule," which created the presumption that prejudice accompanies every trial court error and new trials were required to remedy all instances of error. As one scholar

noted: "[T]he American courts did not change the rule and even in the early twentieth century were still leaving no error unremedied, no matter how inconsequential. . . . Cases were often tried more than once . . . . One particularly glaring example of delay involved a widow who, twenty-three years after filing suit for the proceeds of her husband's life insurance, appeared before the Supreme Court for the second time."[13] S. Goldberg, "Harmless Error: Constitutional Sneak Thief," 71 J. Crim. L. & Criminology 421, 422 (1980).

Attorneys, knowing that any error, no matter how inconsequential, would result in a new trial, "placed error in the record as a hedge against losing the verdict." Id. As the United States Supreme Court explained, "[trials had become] a game for sowing reversible error in the record, only to have repeated the same matching of wits when a new trial had thus been obtained." *Kotteakos* v. *United States*, 328 U.S. 750, 759, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946). A frustrated judge similarly noted that appellate courts "tower above the trials . . . as impregnable citadels of technicality." M. Kavanagh, "Improvement of Administration of Criminal Justice By Exercise of Judicial Power," 11 A.B.A. J. 217, 222 (1925).

With frustration and backlog mounting in the trial courts, harmless error review became the new standard for reviewing errors that had occurred during trial. The purpose of harmless error review was "[t]o substitute judgment for automatic application of rules . . . [and] to preserve review as a check upon arbitrary action and essential unfairness in trials, but at the same time to make the process perform that function without giving men fairly convicted [or held civilly liable] the multiplic-

---

[13] See *Mutual Life Ins. Co.* v. *Hillmon*, 145 U.S. 285, 12 S. Ct. 909, 36 L. Ed. 706 (1892); *Connecticut Mutual Life Ins. Co.* v. *Hillmon*, 188 U.S. 208, 23 S. Ct. 294, 14 L. Ed. 446 (1903); see also *Pressley* v. *Bloomington & Normal Railway & Light Co.*, 271 Ill. 622, 111 N.E. 511 (1916) (retried four times despite no substantial error).

ity of loopholes which any highly rigid and minutely detailed scheme of errors, especially in relation to procedure, will engender and reflect in a printed record." *Kotteakos* v. *United States*, supra, 328 U.S. 760. The United States Supreme Court additionally noted that the goal of harmless error review was "to prevent matters concerned with the mere etiquette of trials and with the formalities and minutiae of procedure from touching the merits of a verdict." *Bruno* v. *United States*, 308 U.S. 287, 294, 60 S. Ct. 198, 84 L. Ed. 257 (1939). As one former member of this court noted, "[t]he doctrine of harmless error is a very elastic one. It has been adopted by courts to avoid ordering new trials because of judicial errors that would not have a substantial impact on the truth finding process and result in an injustice." *State* v. *Valentine*, 240 Conn. 395, 422, 692 A.2d 727 (1997) *(McDonald, J.*, dissenting).

These principles embody the concept of judicial economy. By requiring parties to show harm resulting from error, courts avoid the cost, delay and burden of a new trial when the error failed to affect the underlying fairness of the trial proceeding. See, e.g., *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 601, 922 A.2d 1073 (2007) (judicial economy "minimiz[es] repetitive litigation"); *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 663, 904 A.2d 149 (2006) *(Zarella, J.*, dissenting) ("Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded." [Internal quotation marks omitted.]). Additionally, requiring the complaining party to demonstrate harm promotes equity. We have noted that "[i]t is axiomatic . . . that not every error is harmful. . . . [W]e have often stated that before a party is entitled to a new trial . . . he or she has the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267

Conn. 279, 295, 838 A.2d 135 (2004). Allowing a party to receive a new trial as a result of an error that had no effect on the fairness of the original trial would be inequitable to the opposing party. See, e.g., *Kotteakos* v. *United States*, supra, 328 U.S. 760 (explaining harmless error review as encouraging courts "not [to] be technical, where technicality does not really hurt the party whose rights in the trial and in its outcome the technicality affects" [internal quotation marks omitted]); *Duffy* v. *Vogel*, 49 App. Div. 3d 22, 26, 849 N.Y.S.2d 52 (2007) ("To deprive defendants of the benefit of [their] verdict—one that was fairly earned and entered—for an error not of their making or one for which they bear any responsibility, would, on these facts, be grossly unfair. Moreover, the integrity of this entire [civil trial] process would, in our view, be ill-served by this [c]ourt's sanction of such a result."), rev'd, 12 N.Y.3d 169, 905 N.E.2d 1175, 878 N.Y.S.2d 246 (2009). This is particularly relevant in the present case, where the defendants may be subjected to a second protracted trial for an error they neither committed nor induced.

Partly because of these equitable considerations, harmless error review has become the standard that our Connecticut appellate courts normally use to review errors occurring in civil litigation. See, e.g., *Earlington* v. *Anastasia*, 293 Conn. 194, 201, 976 A.2d 689 (2009) (improper jury interrogatories); *Hayes* v. *Camel*, 283 Conn. 475, 488–89, 927 A.2d 880 (2007) (evidentiary rulings); *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, supra, 267 Conn. 295 (burden of proof instruction); *Brookfield* v. *Candlewood Shores Estates, Inc.*, 201 Conn. 1, 5, 513 A.2d 1218 (1986) (summary judgment rules); see also *Rhode* v. *Milla*, 287 Conn. 731, 738, 949 A.2d 1227 (2008) (right to remain silent pursuant to fifth amendment to federal constitution subjected to undue prejudice review). There is no rule or practice that requires an appellate court to apply a particular stan-

dard of review in civil cases, even when reviewing for structural error.[14] See, e.g., *Carrano* v. *Yale-New Haven Hospital*, supra, 279 Conn. 635 (rejecting argument that one-sided award of additional peremptory challenges is structural error that should be subject to per se reversible error and instead applying harmless error review). Moreover, harmless error review has been the standard of review historically applied in this state to claims of violation of the rules of practice. Our courts "[o]rdinarily . . . apply a harmless error analysis in determining whether a violation of a rule of practice amounts to reversible error." *State* v. *Pare*, supra, 253 Conn. 636; see also *State* v. *Siano*, 216 Conn. 273, 282, 579 A.2d 79 (1990) (when rules of practice violation is not of constitutional dimension, defendant must prove harm); *State* v. *Quintana*, 209 Conn. 34, 40, 547 A.3d 534 (1988) (defendant failed to make requisite harmfulness showing on his rules of practice violation claim); *City Savings Bank of Bridgeport* v. *Dessoff*, 3 Conn. App. 644, 647–48, 491 A.2d 424 (trial court's failure to make ruling required by rules of practice subject to harmless error review), cert. denied, 196 Conn. 811, 495 A.2d 279 (1985).

In the present case, we see no reason to deviate from our well settled use of harmless error review in civil cases in this jury polling case where multiple additional considerations mitigate against such a change. First, the right to poll a jury in civil cases is not based on a statutory right or a constitutional provision. Rather, the right to a jury poll is established solely by the rules of practice. "It has long been understood that Practice Book provisions are not intended to enlarge or abrogate substantive rights. See General Statutes § 51-14 (a) (not-

---

[14] A structural error is "a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . ." (Internal quotation marks omitted.) *State* v. *Lopez*, 271 Conn. 724, 733, 859 A.2d 898 (2004).

ing that rules of practice and procedure 'shall not abridge, enlarge or modify any substantive right or the jurisdiction of any of the courts'); *In re Samantha C.*, 268 Conn. 614, 639, 847 A.2d 883 (2004) ('we are obliged to interpret [the rules of practice] so as not to create a new right, but rather to delineate whatever rights may have existed, statutorily or otherwise, at the time of the proceedings underlying the present appeal'). Accordingly, this court has interpreted provisions of the Practice Book through the lens of the common law." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 292 Conn. 1, 44, 970 A.2d 656, cert. denied, 558 U.S. 991, 130 S. Ct. 500, 175 L. Ed. 2d 348 (2009).

To examine the common-law status of civil jury polling, we turn to the United States Supreme Court, which summarized "[t]hat generally the right to poll a jury exists . . . . It is not a matter which is vital, is frequently not required by litigants, and while it is an undoubted right of either, it is not that which must be found in the proceedings in order to make a valid verdict." *Humphries* v. *District of Columbia*, 174 U.S. 190, 194, 19 S. Ct. 637, 43 L. Ed. 944 (1899). Other federal and state courts also have concluded that jury polling was not an absolute common-law or constitutional right. See *Cabberiza* v. *Moore*, 217 F.3d 1329, 1336 (11th Cir. 2000) ("we know of no constitutional right to have a poll conducted"), cert. denied, 531 U.S. 1170, 121 S. Ct. 1137, 148 L. Ed. 2d 1001 (2001); *United States* v. *Miller*, 59 F.3d 417, 419 (3d Cir. 1995) (jury poll is "not of constitutional dimension"); *Jaca Hernandez* v. *Delgado*, 375 F.2d 584, 585 (1st Cir. 1967) (same); *State* v. *Pare*, supra, 253 Conn. 631 (same); *Cordi* v. *Dixie Highway Express, Inc.*, 276 Ala. 667, 670, 166 So. 2d 396 (1964) ("[a]t common law there was no absolute right to have the jury polled"); *White* v. *Seaboard Coast Line Railroad Co.*, 139 Ga. App. 833, 835, 229 S.E.2d 775 (1976) ("although [jury polling] is a material right

derived from common law, in a civil case it is not an absolute right to which a party is entitled"); *Weir* v. *Luz*, 137 N.J.L. 361, 362, 58 A.2d 550 (1948) (no absolute right to jury poll at common law). There are thus no constitutional or statutory grounds that encourage us to adopt per se reversible error.

Second, jury polling rights are not so vital or necessary as to be a required element in a trial.[15] Connecticut does not mandate polling the jury in every civil or criminal case; we simply give the parties the right to a poll if they so request. Failing to request a jury poll is not deemed per se ineffective assistance of counsel in criminal cases. A habeas court recently has noted that "[criminal] defense counsel is [not] required in all circumstances to poll the jury, absent some indication that the verdict was not unanimous." *J.R.* v. *Commissioner of Correction*, 105 Conn. App. 827, 843, 941 A.2d 348, cert. denied, 286 Conn. 915, 945 A.2d 976 (2008). If a failure to request a poll does not constitute per se ineffective assistance of counsel in a criminal case, it should not be per se reversible error in a civil case. See *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 307, 465 A.2d 294 (1983) ("[w]e see no reason to demand stricter compliance with the standard procedure for delivering and recording a jury verdict in a civil case [than in a criminal case], where there is the additional safeguard of a written form signed by the foreman").

---

[15] The hypothetical posited by the United States Supreme Court in *Humphries* v. *District of Columbia*, supra, 174 U.S. 194–95, makes a telling point: "Suppose, after the jury, at the end of a protracted trial, have agreed upon the verdict and come into court to announce it, and after it has been read in open court but before a poll can be had one of the jurors is suddenly stricken dead, can it be that the whole proceeding theretofore had become thereby a nullity? Can it be that after each of the jurors has signed the verdict and after it has been returned and each is present ready to respond to a poll, the mere inability to complete the poll and make a personal appeal to each renders the entire proceedings of the trial void? We are unable to assent to such a conclusion."

The fact that jury polling in a criminal matter is not so essential as to be a required element of a criminal verdict informs our reading of § 16-32.

Third, this court has noted that "[t]he stability of jury verdicts is and has been of concrete substance to our justice system and, in turn, to the role that system occupies in our society. Thus, courts have held that there is a presumption of regularity in civil proceedings including jury deliberations. . . . *As a general rule, a strong presumption of regularity attaches to every step of a civil proceeding, including jury deliberations, and the burden is on the party seeking a new trial to show affirmatively that irregularity exists.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *McNamee* v. *Woodbury Congregation of Jehovah's Witnesses*, 193 Conn. 15, 26, 475 A.2d 262 (1984) (*Healey, J.*, concurring). As a result, "it is well established that, [i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *Monti* v. *Wenkert*, 287 Conn. 101, 116, 947 A.2d 261 (2008); id., 115 (courts decline to inquire into jury deliberation processes in accordance with presumption of regularity). A jury verdict without apparent defect should be given appropriate deference by our appellate courts.

Fourth, as a practical matter, jury polling rarely reveals anything but unanimity among jurors. The purpose of a jury poll is to ensure that "no juror has been coerced or induced to agree to a verdict to which he [or she] has not fully assented." (Internal quotation marks omitted.) *State* v. *Pare*, supra, 253 Conn. 631; see also *Duffy* v. *Vogel*, supra, 12 N.Y.3d 173–74 (describing common-law origins and purpose of jury poll).[16] In theory, a poll gives a timid juror who was pressured into

---

[16] Pursuant to Practice Book § 16-30, civil jury verdicts must be unanimous.

reaching a certain verdict the opportunity to express his or her dissent from the verdict. This timid juror must do so, however, on the record, in open court and in front of the judge, parties, attorneys, court clerks and his fellow jurors. As this court previously has noted, "rarely does an individual poll reveal that a juror assented to a verdict despite reservation regarding the defendant's guilt . . . ." *State* v. *Pare*, supra, 639. Other courts similarly have noted that jury polls rarely reveal a lack of unanimity. "In almost every case, the poll will confirm the verdict [that is] announced by the foreperson. There are experienced trial lawyers who have never seen a verdict upset by a jury poll—and others who have seen it once, and tell the story to the end of their days." *Duffy* v. *Vogel*, supra, 179 (Smith, J., dissenting); see also *Jaca Hernandez* v. *Delgado*, supra, 375 F.2d 586 (not likely "that members of a jury would listen to, or speak collectively in support of, their foreman and immediately thereafter contradict themselves if asked to speak individually"). We are therefore disinclined to apply per se reversible error to a rule of practice that rarely reveals the error it was designed to detect.[17]

Fifth, a significant number of other states with mandatory polling provisions do not apply per se reversible error to a trial court's failure to poll. These states include California, Illinois, Missouri, Montana, New Jersey, New Mexico, Texas, and Wyoming.[18] Cf. *Duffy* v.

---

[17] The dissent, citing *Pare*, acknowledges that a jury poll rarely reveals a lack of unanimity. It nevertheless argues that the failure to poll on request should be reversible per se. We fail to see the wisdom in automatically ordering a new trial for the failure to follow a procedure that rarely reveals a defect in the trial process.

[18] *Redo Y CIA* v. *First National Bank*, 200 Cal. 161, 167, 252 P. 587 (1926) ("Assuming that error was committed by the trial court in refusing the appellant's request for a poll of the jury, we think no prejudice resulted therefrom. . . . [T]he polling of the jury would have been a 'mere useless ceremony.' "); *Roth* v. *Meeker*, 72 Ill. App. 3d 66, 79–80, 389 N.E.2d 1248 (1979) (trial court's refusal to poll jury to determine whether jurors influenced by newspaper articles did not constitute reversible error); *Walton Construction*

*Vogel*, supra, 12 N.Y.3d 169 (applying per se reversible error); *Sandford* v. *Chevrolet Division of General Motors*, 52 Or. App. 579, 586–87, 629 P.2d 407 (1981) (trial court must conduct poll correctly or be subjected to per se reversible error), aff'd, 292 Or. 590, 642 P.2d 624 (1982).

For all of these reasons, we reject the plaintiff's claim that we should return to our pre-twentieth century standard of per se reversible error solely for the failure to grant a request for a jury poll. We conclude, instead, that a trial court's refusal to poll a jury in violation of the mandatory provisions of § 16-32 is subject to harmless error review.

The plaintiff and the dissenting justices encourage us to rely on the reasoning of *Duffy* v. *Vogel*, supra, 12 N.Y.3d 169, and *State* v. *Pare*, supra, 253 Conn. 611, in order to conclude that a trial court's denial of a request to poll a civil jury constitutes per se reversible error. Both of these cases are readily distinguishable from the present one, however, thereby rendering adoption of their analysis inappropriate.

In *Duffy*, the New York Court of Appeals' decision to apply per se reversible error rested heavily on its

*Co.* v. *MGM Masonry, Inc.*, 199 S.W.3d 799, 806 (Mo. App. 2006) (refusing to hold that failure to poll jury in civil case constitutes per se reversible error, instead noting that reversal is not required where refusal was not prejudicial); *Martello* v. *Darlow*, 151 Mont. 232, 235–36, 441 P.2d 175 (1968) (lower court abused discretion in granting new trial on ground that it improperly refused request for jury poll since any error was harmless); *Ragusa* v. *Lau*, 119 N.J. 276, 283–84, 575 A.2d 8 (1990) (failure to conduct poll in correct manner subject to harmless error); *Levine* v. *Gallup Sand & Gravel Co.*, 82 N.M. 703, 704, 487 P.2d 131 (1971) ("the mere failure to poll the jury upon proper request does not in itself constitute reversible error"); *Suggs* v. *Fitch*, 64 S.W.3d 658, 661 (Tex. App. 2001) ("[f]ailure to separately and individually poll each juror is subject to harmless error analysis"); *Garnick* v. *Teton County School District No. 1*, 39 P.3d 1034, 1047 (Wyo. 2002) (concluding trial court did not abuse discretion in denying motion for new trial based on refusal to poll jury when complaining party failed to object or ask for poll).

determination that civil jury polling had a lengthy and strong common-law history in New York. The court explained that "we have long recognized that affording jurors a last opportunity individually to express agreement or disagreement with the reported verdict, is, when requested by a litigant, indispensable to a properly published, and thereby perfected, verdict . . . . That a verdict may not be deemed finished or perfected until it is recorded, and that it may not be validly recorded without a jury poll where one has been sought . . . have been uncontroversial propositions. . . . [T]hey have been applied over the years with axiomatic force by New York's intermediate appellate courts . . . ." (Citations omitted; internal quotation marks omitted.) *Duffy* v. *Vogel,* supra, 12 N.Y.3d 174–75. The court relied on New York case law spanning more than 150 years, from 1851 through 2005, emphasizing both the historical and continued significance of civil jury polling in New York state. Id. In rendering its decision, the Court of Appeals was quite conscious that it was not "writing upon a clean slate." Id., 177. Connecticut, however, lacks this lengthy and prevalent common-law tradition favoring mandatory civil jury polling. As previously set forth herein, jury polling in a civil proceeding is a right created by a fairly recently enacted Practice Book provision and is not based on any long-standing judicial, constitutional or statutory constructs. The New York Court of Appeals' analysis in *Duffy,* which relied heavily on the historical significance of civil jury polling in New York, therefore is inapplicable to our present analysis.

In *State* v. *Pare,* supra, 253 Conn. 635–36, this court had the opportunity to consider whether a denial of a request to poll a jury in a *criminal* trial constituted per se reversible error. The defendant in *Pare* was charged with murder. Id., 612. At the close of trial, the trial court "instructed the jury at length, enumerating seven possible verdicts that might be returned," and also

instructed the jury on the mitigating factor of extreme emotional disturbance. Id., 616. The jury requested a number of readbacks of both trial testimony and the jury charge, including the instruction on extreme emotional disturbance. Id. "The jury also sought clarification on the effect of its inability to reach a unanimous verdict on the defense of extreme emotional disturbance, questioning whether, under that circumstance, the jury becomes deadlocked or the verdict reverts to murder." Id. Finally, after the jury indicated its inability to reach a unanimous verdict, the trial court gave a "Chip Smith" charge reminding the jury that it must act unanimously and encouraging the members of the jury to reach unanimity. Id., 616 and n.4. Soon after receiving that instruction, the jury returned a verdict of guilty. Id., 617.[19]

The trial court denied a subsequent request by the defendant to poll the jury. Id., 619–20. On appeal, the defendant argued that the denial of his request constituted per se reversible error. Id., 613, 620. This court concluded that the "weighty interest[s]" and constitutional concerns inherent in criminal trials required application of per se reversible error. Id., 639. The court explicitly stated that "because the purpose of permitting an individual poll is to protect the accused's *constitutional right to an acquittal* in the absence of the full consensus of each juror, the denial of a timely request to poll is of substantial and unique magnitude. . . . [T]he action of the court [in denying a timely request to poll the jury] work[s] a *denial of a right of the accused so fundamental as to require a retrial* . . . . [I]t is better that the case be tried again than that a precedent impairing a defendant's right to a poll of the jury be engrafted on our criminal procedure." (Emphasis added; internal quotation marks omitted.) Id., 636. The court's analysis thus centered on the fundamental and

---

[19] This evidence of lack of unanimity is in stark contrast with the present case, where there was no indication at all of a lack of unanimity.

constitutional rights of a defendant in a criminal pro-
ceeding.[20]

The criminal concerns underlying *Pare* are inapplica-
ble, however, in the civil context. Criminal litigation,
which adjudicates guilt and liberty, is inherently and
functionally distinct from civil litigation, which incorpo-
rates notions of equity. See, e.g., *Foucha v. Lousiana*,
504 U.S. 71, 93, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992)
(Kennedy, J., dissenting) (noting "heightened due pro-
cess scrutiny" given to criminal cases). These founda-
tional differences affect both the structure and form of
criminal and civil cases, often resulting in the applica-
tion of less stringent rules in the civil context.[21] For
instance, Justice Harlan once explained that "we view
it as no more serious in general for there to be an
erroneous [civil] verdict in the defendant's favor than
for there to be an erroneous verdict in the plaintiff's
favor. A preponderance of the evidence standard there-
fore seems peculiarly appropriate [for civil cases]
. . . . In a criminal case, on the other hand, we do not
view the social disutility of convicting an innocent man
as equivalent to the disutility of acquitting someone who
is guilty. . . . In this context, I view the requirement of
proof beyond a reasonable doubt in a criminal case as
bottomed on a fundamental value determination of our
society that it is far worse to convict an innocent man

---

[20] The dissent attempts to minimize the true constitutional underpinnings
of *Pare*. As the quotation from *State v. Pare*, supra, 253 Conn. 636, that we
set forth in the text of the opinion indicates, however, *Pare* rests expressly
on the defendant's constitutional right to an acquittal if the jurors are not
unanimous.

[21] The dissent asserts that the scope of interests protected by a jury poll
in a civil trial is the same as in a criminal trial. To strengthen this claim, it
notes that the present case is a wrongful death action brought pursuant to 42
U.S.C. § 1983. Because these actions are designed to enforce constitutional
provisions, the dissent claims that they are of equal magnitude to criminal
trials. We disagree. A § 1983 claim is still, at its core, a civil claim for
monetary damages; notions of personal liberty and innocence, which were
so critical in *Pare*, are nonetheless lacking.

than to let a guilty man go free." (Citation omitted.) *In re Winship*, 397 U.S. 358, 371–72, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring); see *State* v. *Lawrence*, 282 Conn. 141, 193–94, 920 A.2d 236 (2007) (*Katz, J.*, dissenting) (citing approvingly Justice Harlan's concurrence in *In re Winship*).[22]

Despite this court's reliance in *Pare*[23] on the important criminal rights of a defendant, the plaintiff encourages us to rely on its reasoning that because we cannot know the results of a poll not taken, a failure to poll is never harmless. *State* v. *Pare*, supra, 253 Conn. 639. We disagree. The fact that a court cannot divine the intention of civil jurors does not warrant per se reversal of their verdicts.[24] Harmless error review is

[22] Given the risk of convicting an innocent person in a criminal trial; see *United States* v. *Cronic*, 466 U.S. 648, 655, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) ("the ultimate objective [of criminal law is] that the guilty be convicted and the innocent go free" [internal quotation marks omitted]); *State* v. *Sawyer*, 279 Conn. 331, 354, 904 A.2d 101 (2006) ("[the] fundamental purpose of our criminal justice system [is] . . . to convict the guilty and acquit the innocent"); forty-nine states require a criminal jury's verdict to be unanimous. In contrast, thirty states allow less than unanimous verdicts in civil cases. See D. Rottman & S. Strickland, State Court Organization 2004 (U.S. Dept. of Justice, Bureau of Justice Statistics, 2006), table 42, available at http://www.ojp.usdoj.gov/bjs/.

[23] Additionally, the court in *Pare* cited extensive precedent from other state and federal jurisdictions that similarly adopted per se reversible error for a trial court's refusal to conduct a jury poll in a criminal trial. *State* v. *Pare*, supra, 253 Conn. 636–37. As we have noted previously, a large number of our sister courts apply standards less stringent than reversible error when considering civil jury polls. Further, the Federal Rules of Civil Procedure recently were amended to create a mandatory right to poll the jury; see footnote 8 of this opinion; but as of now, there is no case law determining the appropriate standard of review to apply to violations of this rule. See Fed. R. Civ. P. 48 (c).

Moreover, the court in *State* v. *Pare*, supra, 253 Conn. 622, relied on the well settled maxim that in interpreting criminal statutes and the rules of practice, ambiguities are resolved in favor of the defendant. This maxim is inapplicable to civil provisions.

[24] Given that this is an issue of first impression in our court despite the application of § 16-32 for more than twenty years, we think it is likely that trial courts do not often deny a timely request to poll the jury in a civil case. Additionally, given our clarification in this opinion that the right to

sufficient for reviewing the verdict because it allows appellate courts to review the record for inconsistencies in the verdict, juror confusion or other indications that the parties' right to a unanimous verdict was compromised. We are mindful of our previous discussion that harmless error review has been of great value in avoiding needless and inequitable retrials. As the dissent in *Duffy* summarized: "I cannot say I am absolutely certain that the trial court's error here was harmless— but that can never be said, of any error. The sort of fanciful possibility that the majority relies on exists in every case, and if it were given the kind of weight the majority gives it here, the harmless error doctrine would not exist." *Duffy* v. *Vogel,* supra, 12 N.Y.3d 180 (Smith, J., dissenting). Although this court concluded that per se reversal was appropriate in *Pare,* that conclusion rested largely on principles and precedent applicable only to criminal trials, not to trials in the civil context.

We now must determine whether the trial court's refusal to poll the jury in the present case was harmless. As we previously have stated herein, the trial court reasoned that "even if the provisions of . . . § [16-32] are mandatory, the court finds that its denial of the plaintiff's request to poll the jury was harmless. The jury in this case did not indicate any confusion regarding the charge or lack of unanimity in the course of their deliberations and the eleven page form containing the interrogatories and verdict shows no indication of any inconsistencies. The plaintiff has made no argument that the denial of her request to poll the jury affected the outcome of the trial."

We agree that there is no evidence in the record indicative of any harm to the plaintiff resulting from

poll under § 16-32 is mandatory, we are confident that trial courts in the future will honor timely requests pursuant to § 16-32. Unlike the dissent, we trust that trial judges will not violate the rule "with impunity."

the trial court's failure to conduct a poll of the jury because there is no evidence suggesting that the jury was in any way divided. The jury did not send the trial judge any notes indicating a lack of agreement and the jury completely answered eleven pages of interrogatories without any inconsistencies. Despite a long and complex trial with multiple defendants, the jury required only three hours of deliberation, which suggests that the deliberations were focused and harmonious. See, e.g., *People* v. *Masajo*, 41 Cal. App. 4th 1335, 1340, 49 Cal. Rptr. 2d 234 (1996) ("[s]uch swift deliberation is indicative of unanimity of opinion—not lengthy coercion of a holdout juror"). Moreover, we are mindful of the trial court's comments that the jury was "attentive" and that it delivered a "thoughtful verdict." The trial court had the distinct advantage of observing the jury throughout the entire trial, including the return of its verdict, and in no instance noted uncertainty from any juror.[25] There is nothing in the record that indicates that a poll would have revealed anything other than unanimity among the jurors. As a result, the plaintiff has failed to show that she suffered any harm resulting from the trial court's refusal to poll the jury.

The judgment is affirmed.

In this opinion NORCOTT, PALMER, ZARELLA and McLACHLAN, Js., concurred.

ROGERS, C. J., with whom KATZ, J., joins, dissenting. I agree with the conclusion in part I of the majority opinion that Practice Book § 16-32 clearly imposes a mandatory obligation on the trial court to poll the jury upon the timely request of either party. I respectfully

---

[25] We find it troubling that the dissent gives no apparent deference to the firsthand observations of the trial court. In the present case, a thoroughly experienced trial judge had the unique advantage of observing the jury for more than four weeks and saw no indication of confusion or lack of unanimity. We credit the trial court's observations.

dissent, however, from the conclusion in part II of the majority opinion that the trial court's refusal to poll the jury upon the timely request of the plaintiff, Elaine Wiseman,[1] is amenable to harmless error analysis. I disagree because there is no way to meaningfully assess the results of a poll that was not taken. Moreover, by requiring the plaintiff to prove the harm that the trial court might have revealed had it complied with a mandatory rule, we diminish the impact of our holding that Practice Book § 16-32 is mandatory and undermine the ideal of fairness in our trial process.

In general, jury polls are a simple and important means of reinforcing confidence in a jury's verdict by confirming, in open court, that each individual juror assents to the verdict.[2] A typical jury poll should occupy

---

[1] The plaintiff appeals in her capacity as administratrix of the estate of her deceased son, Bryant Wiseman.

[2] Although this is our first opportunity to consider whether the need for a remedy for the denial of a party's right to poll a civil jury established in Practice Book § 16-32 varies in degree from the need for a remedy for the denial of a party's right to poll a criminal jury established in Practice Book § 42-31, other courts have long recognized that, in both criminal and civil cases, jury polls are the only allowable means of ensuring that each juror assents to the verdict. See, e.g., *James* v. *State*, 55 Miss. 57, 59 (1877) ("Examining the jury by the poll is the only recognized means of ascertaining whether they were unanimous in their decision, and the right to do this must exist. It is affirmed in criminal cases, and is *equally applicable in civil cases*. In no other way can the right of parties to the concurrence of the twelve jurors be so effectually secured as by entitling them to have each juror to answer the question, 'Is this your verdict?' in the presence of the court and parties and counsel. By this means any juror who had been induced in the jury-room to yield assent to a verdict, against his conscientious convictions, may have opportunity to declare his dissent from the verdict as announced. Parties should have the means to protect themselves against the consequences of undue influences of any sort, which, employed in the privacy of the jury-room, may extort unwilling assent to a given result by some of the jury. *Less evil is likely to result from upholding the right to have the jury examined by the poll than [from] denying it. The modern relaxation of the rules as to what irregularities of the jury will vitiate a verdict makes it more important to preserve the only allowable means of ascertaining if the verdict as announced is the unanimous decision of the jury.*" [Emphasis added.]).

no more of the trial court's time than the minute or two it takes the court to ask the jurors individually whether each one agrees with the verdict. See *Duffy* v. *Vogel*, 12 N.Y.3d 169, 180, 905 N.E.2d 1175, 878 N.Y.S.2d 246 (2009) (Smith, J., dissenting) (noting jury polls are "short and simple"). Thus, the benefits associated with providing each party the opportunity to test a verdict for irregularities far outweigh the slight burden associated with conducting a jury poll.

In *State* v. *Pare*, 253 Conn. 611, 637, 755 A.2d 180 (2000), this court held that, in a criminal case, a trial court's refusal to honor a timely request to poll the jury is not amenable to harmless error. See id., 639 ("in light of the weighty interest protected by a jury poll, and the impracticality of gauging the results of a poll not taken, we conclude that a violation of a party's timely polling request requires automatic reversal of the judgment"). We based our decision in *Pare* on two considerations: (1) the nature of the interests implicated by the trial court's refusal to poll the jury; and (2) the impracticality of gauging the results of a poll not taken. Id.

In reaching its conclusion that the refusal to poll a jury in a civil case should not result in an automatic reversal, the majority considered a number of factors beyond the primary considerations underlying our decision in *Pare*. The majority fails, however, to acknowledge that many of those additional factors apply equally in both the criminal and civil contexts.

First, the majority notes that the right to a jury poll in a civil case is not based on a statutory right or constitutional provision. No statute or constitutional provision establishes a right to a jury poll in the criminal context, either. In both contexts, the right to poll the jury is established by a rule of practice. See Practice Book §§ 16-32 and 42-31.

Second, the majority notes that jury polling rights are not so vital or necessary as to be a required element in a civil trial. Again, this is also true in the criminal context. Whether in a civil or criminal case, a party must request a jury poll, and a party can waive the right to a jury poll by failing to make a timely request. See *State* v. *Pare*, supra, 253 Conn. 627 ("[f]ailure to make a timely demand or request for a poll, where there has been reasonable opportunity to do so, operates as a waiver of the right"); see also 75B Am. Jur. 2d 320, Trial § 1528 (2007) ("[t]he right to poll may be waived by failure to exercise it at the proper time"). Thus, there is no independent obligation on the court in either a civil or a criminal case to poll the jury in the absence of a timely request.

Third, the majority notes that jury polling rarely reveals anything but unanimity among jurors. Again, there is nothing to suggest that a jury poll is more likely to reveal a lack of unanimity in the criminal context than in the civil context. Indeed, in *Pare*, this court specifically recognized that jury polls rarely uncover a lack of unanimity. See *State* v. *Pare*, supra, 253 Conn. 639 ("rarely does an individual poll reveal that a juror assented to a verdict despite reservation").

Although all three factors weigh against the utility or importance of jury polls in both the criminal and civil contexts, none of these factors precluded this court from concluding, in the criminal context, that "a violation of a party's timely polling request requires automatic reversal of the judgment." Id. The majority simply identifies these factors without addressing why, although the factors are present in a criminal context, they should lead to a contrary result when this court is faced with a refusal to poll in the civil context.

The majority also emphasizes the strong presumption of regularity that "attaches to every step of a civil pro-

ceeding, including jury deliberations . . . ." (Internal quotation marks omitted.) Because the very purpose of a jury poll is to uncover an undisclosed irregularity in a jury's verdict, however, the fact that Practice Book § 16-32 gives the parties to a civil action an absolute right to poll the jury is a strong indication that jury polls serve as an exception to the general presumption of regularity. Thus, any presumption of regularity should not weigh heavily in our consideration of whether the violation of a mandatory rule should be subject to harmless error review.[3]

Because it is clear that the general concerns relating to the utility, effectiveness or importance of jury polls apply equally in both civil and criminal cases, the only meaningful distinction between this case and *Pare* lies in the scope of the interests jeopardized by the denial of a request to poll in a criminal case as compared to the interests jeopardized in a civil case.

[3] The majority also points to the fact that New York and Oregon are the only other states with mandatory polling provisions whose courts have found the failure to poll in a civil case to be per se reversible error. *Duffy* v. *Vogel*, supra, 12 N.Y.3d 177 ("[h]armless error analysis in this context would amount to no more than a speculative exercise, impermissibly substituting the judgments of judges for those that would have been made and disclosed by jurors had their verdict been properly pronounced in open court"); *Sandford* v. *Chevrolet Division of General Motors*, 292 Or. 590, 614, 642 P.2d 624 (1982) (impossible to determine whether failure to correctly poll jury was harmless).

Connecticut is distinguishable from many of the other states to which the majority refers. First, this court has previously held that the violation of the right to poll the jury in the criminal context is grounds for automatic reversal. See *State* v. *Pare*, supra, 253 Conn. 639. Second, one of the purposes of jury polls is to ensure unanimity, and we are among the minority of states that require verdicts in civil actions to be unanimous. See Practice Book § 16-30; *McNamee* v. *Woodbury Congregation of Jehovah's Witnesses*, 194 Conn. 645, 647, 484 A.2d 940 (1984). Third, we recognize explicitly the absolute right to poll the jury upon request in two separate rules of practice that use virtually identical language. See Practice Book §§ 16-32 and 42-31. In short, given these unique circumstances, the majority relies on cases that are not sufficiently analogous to provide significant guidance.

According to the majority, our decision in *Pare* was based on concern for the fundamental constitutional rights of criminal defendants. I would note, however, that if the concern in *Pare* was solely the criminal defendant's fundamental constitutional rights, we would not have held that "a trial court is required to conduct an individual poll of the jury pursuant to a timely request by *either party.*" (Emphasis added.) *State* v. *Pare,* supra, 253 Conn. 625; id., 639 ("a violation of a *party's* timely polling request requires automatic reversal" [emphasis added]). A fair reading of *Pare* suggests that our conclusion that certain interests are substantial enough to establish an absolute right to poll the jury— the violation of which requires automatic reversal— was based on the interests of both the criminal defendant and the interests of the state.

Additionally, as the facts of this case demonstrate, civil actions frequently involve extremely important interests. The plaintiff has brought a wrongful death action pursuant to § 1983 of title 42 of the United States Code. See 42 U.S.C. § 1983 ("[e]very person who, under color of [law] . . . custom, or usage, of any [s]tate . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the [c]onstitution and laws, shall be liable to the party injured in an action at law"); see also *Wyatt* v. *Cole,* 504 U.S. 158, 161, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992) ("[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails"). Specifically, the plaintiff has alleged that her son's death resulted from the state's violation of his eighth and fourteenth amendment rights under the United States constitution to be free from the use of excessive physical force and to adequate medical and mental health care while in state custody.[4]

---

[4] If there is a logical or consequential distinction between the state's interest in securing a criminal conviction and a plaintiff's interest in a § 1983

Even if the plaintiff's claim did not implicate constitutional rights, all parties to a civil action, like criminal defendants, enjoy a right to a unanimous verdict. See Practice Book § 16-30; *McNamee* v. *Woodbury Congregation of Jehovah's Witnesses*, 194 Conn. 645, 647, 484 A.2d 940 (1984) ("[i]n this state it is required that jury verdicts be unanimous, requiring each juror to decide the case individually after impartial consideration of the evidence"); see also *Ragusa* v. *Lau*, 119 N.J. 276, 283, 575 A.2d 8 (1990) ("The parties in civil cases, like those in criminal cases, have an interest in determining each juror's position concerning the verdict. If that were not so, the [r]ule [of practice pertaining to jury polls] would not provide for a poll in civil cases."). The history of that right has deep roots in the common law as well as constitutional underpinnings. See *State* v. *Gannon*, 75 Conn. 206, 226–33, 52 A. 727 (1902) (chronicling history and essential features of right to trial by jury in Connecticut). As the majority acknowledges, by "[p]roviding parties with the opportunity to confirm the unanimity of the verdict [the right to poll in a civil case] perpetuates justice, ensures transparency and creates consistency in the rules of practice." In essence, the right to poll enhances confidence in the fairness of our system of justice. The interest in enhancing confidence in our courts extends equally to the criminal and civil contexts, and while the right to poll is not of constitutional magnitude, it serves to protect a fundamental interest of our judiciary. See *State* v. *Coleman*, 242

action in redressing alleged constitutional violations resulting in the death of an individual in state custody, the majority has failed to explain what that distinction might be. Moreover, even if *Pare* was based solely on the criminal defendant's interest in protecting his constitutional right to a unanimous verdict, the right to a unanimous verdict is no less important in a civil case. Indeed, the majority makes no attempt to explain why a criminal defendant's liberty interest is substantially more important than an individual's interests in remaining free from excessive physical force and receiving adequate medical care while in state custody.

Conn. 523, 541, 700 A.2d 14 (1997) ("[a]n important function of this court is to ensure public confidence in the integrity of the judicial system").

The majority also minimizes the extent to which *Pare* considered the impracticality of subjecting a trial court's refusal to poll the jury to harmless error analysis. In light of this impracticality, by subjecting a trial court's refusal to poll the jury to harmless error analysis, we effectively allow a trial court to violate the rule with impunity. The conclusion that Practice Book § 16-32 is mandatory serves little purpose if a violation of the rule carries no consequences. The denial of a request to poll will only harm the requesting party if the jury's verdict is the result of coercion or lacks unanimity. Cf. 8 J. Wigmore, Evidence (McNaughton Rev. 1961) § 2355, p. 717 ("[t]he very purpose of [the jury poll] is to afford an opportunity for free expression unhampered by the fears or the errors which may have attended the private proceedings"). By requiring the requesting party to bear the burden of proving harm, when the trial court's error itself deprives the requesting party of the means to demonstrate harm, the majority severely undercuts its conclusion that the rule is mandatory.[5] Furthermore, in order to assess whether the denial of a request to poll a jury is harmful, the reviewing court can only speculate as to whether each individual juror voluntarily assented to the verdict. See *Duffy* v. *Vogel,* supra, 12 N.Y.3d

[5] At least one state has accounted for the difficulty in showing what harm a refusal to poll may cause by easing the burden of proof. See *Levine* v. *Gallup Sand & Gravel Co.*, 82 N.M. 703, 704, 487 P.2d 131 (1971) ("[w]e will accept the slightest evidence of prejudice, and all doubt will be resolved in favor of the party claiming prejudice" [internal quotation marks omitted]); see also *Duffy* v. *Vogel*, supra, 12 N.Y.3d 180 (Smith, J., dissenting) (discussing risk that trial judges "will be tempted to reject requests for jury polls, knowing that the harmlessness of the error will protect them from reversal" and considering, as precaution, "limiting the application of the harmless error doctrine to cases where there is a particularly strong reason to think the jury poll would not have changed the result").

177 ("[h]armless error analysis in this context would amount to no more than a speculative exercise"); *Sandford* v. *Chevrolet Division of General Motors*, 292 Or. 590, 614, 642 P.2d 624 (1982) ("it was impossible to say that the failure correctly to poll the divided jury was harmless error"). Accordingly, I dissent not because I believe that a failure to poll the jury always causes harm, as the plaintiff contends, but, because it is impossible to meaningfully analyze *whether* a given refusal to poll was harmful or not. See *State* v. *Pare*, supra, 253 Conn. 637 ("[w]e disagree with the state's contention that polling violations are amenable to harmless error analysis"); cf. R. Traynor, The Riddle of Harmless Error (1970), pp. 64–73 (discussing many errors that cannot be held harmless because their effect, if any, on verdict cannot possibly be determined).

The majority concludes that the trial court's failure to poll the jury was harmless because "there is no evidence suggesting that the jury was in any way divided." Thus, the majority suggests that a requesting party might show harm by pointing to evidence of juror confusion or protracted deliberations. In *Pare*, however, this court rejected the contention that a reviewing court can assess the harm of a failure to poll by looking for outward manifestations of a lack of unanimity.[6] See *State* v. *Pare*, supra, 253 Conn. 637 (rejecting state's argument that "in the absence of any indication of dissent, the

---

[6] A Chip Smith instruction is given when the jury cannot reach a unanimous verdict. *State* v. *O'Neil*, 261 Conn. 49, 60, 801 A.2d 730 (2002) ("[Chip Smith instruction] makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors" [internal quotation marks omitted]). That instruction is given in both civil and criminal cases. *Tough* v. *Ives*, 162 Conn. 274, 278, 294 A.2d 67 (1972); see *Wheeler* v. *Thomas*, 67 Conn. 577, 580, 35 A. 499 (1896) (approving Chip Smith instruction in civil case). Yet, in *Pare*, we implicitly rejected the proposition that the need for such an instruction would demonstrate harm from a failure to poll the jury.

jury's affirmative responses as a body provides a sufficient guarantee of unanimity to render the lack of individual interrogation harmless"); see also *Judson* v. *Brown*, 98 Conn. App. 381, 383, 908 A.2d 1142 (2006) ("[t]he length of time that a jury deliberates has no bearing on nor does it directly correlate to the strength or correctness of its conclusions or the validity of its verdict" [internal quotation marks omitted]).

Jury polls, moreover, verify not only that a verdict is unanimous, but also that it is free from coercion. See *State* v. *Allen*, 289 Conn. 550, 572, 958 A.2d 1214 (2008) ("[p]olling enables the court to ascertain with certainty that a unanimous verdict has in fact been recorded and that no juror has been coerced or induced to agree to a verdict to which he [or she] has not fully assented" [internal quotation marks omitted]); see also *United States* v. *Gambino*, 951 F.2d 498, 502 (2d Cir. 1991) ("[t]he purpose of a jury poll is to test the uncoerced unanimity of the verdict by requiring each juror to answer for himself, thus creating individual responsibility, eliminating any uncertainty as to the verdict announced by the foreman" [internal quotation marks omitted]), cert. denied sub nom. *D'Amico* v. *United States*, 504 U.S. 918, 112 S. Ct. 1962, 118 L. Ed. 2d 563 (1992). Because we so carefully protect jury deliberations by limiting intrusions into the secrecy of the process, it is doubtful that a party outside of the jury could ever point to evidence of juror coercion.[7] See *Tanner* v. *United States*, 483 U.S. 107, 127, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987) ("long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry"). The fact remains that the best method for uncovering juror coercion is to ask each

---

[7] The majority's harmless error analysis focuses on the absence of any indication that the jury lacked unanimity without ever addressing or considering the possibility of juror coercion. Indeed, the majority fails to acknowledge that jury polls also serve to ensure that verdicts are free from coercion.

juror, in the presence of the court, the parties and counsel, to confirm their assent to the verdict. See *State* v. *Milton,* 178 N.J. 421, 433, 840 A.2d 835 (2004) ("the juror's concurrence with the verdict at the time of the poll is at least as important as the juror's agreement in the jury room").

By applying harmless error review in this case, the majority has effectively interpreted Practice Book § 16-32 to be mandatory only when the requesting party can demonstrate some threshold justification for conducting a jury poll. Such a rule is not consistent with the language of Practice Book § 16-32 or our conclusion that the rule is mandatory. Thus, the application of harmless error analysis in this context jeopardizes confidence in the fairness of our system.

In my view, we do not promote any notion of fairness when we allow a trial court to ignore a mandatory rule of practice, thereby depriving the requesting party of the opportunity to test the validity of a verdict, and then conclude that the violation was harmless because the requesting party has not produced any evidence that the verdict was tainted. Cf. S. Goldberg, "Harmless Error: Constitutional Sneak Thief," 71 J. Crim. L. & Criminology 421, 442 (1980) ("[l]awyers should pause at the proposition that government can violate a basic restriction upon itself and, through a court, tell the individual who was the beneficiary of the restriction: 'no harm-no foul' "). For the foregoing reasons, I respectfully dissent.